HENNIGAN, BENNETT & DORMAN LLP
Bennett J. Murphy (SBN 174536)
James O. Johnston (SBN 167330)
Linda A. Kontos (SBN 185016)
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone:     (213) 694-1200
Fax:           (213) 694-1234

*Counsel for Ronald Greenspan*
*Chapter 7 Trustee for Brobeck, Phleger & Harrison LLP*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 03-32715-DM7 |
| BROBECK, PHLEGER & HARRISON LLP, | Chapter 7 |
| Debtor. | **NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP** |
| | Hearing |
| | Date:    August 6, 2004 |
| | Time:    10:00 a.m. |
| | Place:   Courtroom 22 |
| |          235 Pine Street |
| |          San Francisco, CA 94104 |
| | Judge:   Hon. Dennis Montali |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Case No. 03-32715-DM7    Filed ... Page 1 of 28

# TABLE OF CONTENTS

(Page)

I.     RELIEF REQUESTED ................................................................ 1

II.    INTRODUCTION ................................................................... 1

III.   FACTUAL BACKGROUND ................................................... 3

     A.     Events Leading Up To The Debtor's Bankruptcy. ........................... 3

     B.     The Debtor's Retention Of The Firm. ....................................... 4

     C.     The Purported "Waiver" Of The Firm's Conflict Of Interest. ........... 6

     D.     The Subpoena Issued To The Firm And The Resulting Motion To Quash. .......................................................................... 7

     E.     The Firm Seeks Permission On Behalf Of The Partners To File An Opposition To The Motion To Approve The Settlement Agreement With The Clifford Chance Parties. ............................................ 8

IV.   ARGUMENT .......................................................................... 9

     A.     Well-Established Ethical Rules Preclude The Firm's Representation Of The Partners And Require The Firm's Disqualification. ............. 9

         1.     Representation Of The Partners Would Violate The Firm's Duty Of Loyalty To The Debtor. ..................................... 10

         2.     The Firm Violated The "Hot Potato Rule" By "Dropping" The Debtor In Favor Of The Partners. ............................ 12

         3.     The Firm Violated Its Duty To Maintain Client Confidences. .......... 14

     B.     The Purported "Waiver" Executed By The Chairman Of The Liquidation Committee On Behalf Of The Debtor Is Ineffective. ........ 18

         1.     Waiver By An Interested Party Is Prohibited. ..................... 18

         2.     The Purported Waiver Was Untimely. ............................. 20

         3.     The Waiver Was Given In Violation Of The Duties Of The Liquidation Committee As Managers Of An Insolvent Firm. ......... 20

         4.     The Purported Waiver Was Beyond The Scope Of The Winding Up The Business Of The Firm. ............................ 21

     C.     Denial Of This Motion On The Basis Of Delay Is Not Warranted. ....... 21

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-i-

Case: 08-32715   Doc# 039   Filed:     Entered: 07/28/08     Page 2 of
28

## TABLE OF CONTENTS (cont'd)

**(Page)**

V.       CONCLUSION .............................................................................................. 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS
COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

# TABLE OF AUTHORITIES

(Page)

**Cases**

*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,*
 96 Cal. App. 4th 1017 (2002) ............................................................ 12, 13

*City National Bank v. Adams,* 96 Cal. App. 4th 315 (2002) ............................ 15

*Farris v. Fireman's Fund Ins. Co.,*
 119 Cal. App. 4th 671 (2004) ............................................................ 18

*Flatt v. Superior Court,*
 9 Cal. 4th 275 (1994) ............................................................ 11, 12, 14, 15

*H. F. Ahmanson & Co. v. Salomon Brothers,*
 229 Cal. App. 3d 1445 (1991) ............................................................ 14, 15

*Henricksen v. Great American Savings & Loan,*
 11 Cal. App. 4th 109 (1992) ............................................................ 15

*In re Hampton Hotel Investors, L.P.,*
 270 B.R. 346 (S.D.N.Y. 2001) ............................................................ 20

*In re Jaeger,*
 213 B.R. 578 (Bankr. C.D. Cal. 1997) ............................................................ 10, 20, 22

*In re Plaza Hotel Corp.,*
 111 B.R. 882 (Bankr. E.D. Cal. 1990) ............................................................ 19

*In re South Pacific Island Airways,*
 68 B.R. 574 (Bankr. D. Hawaii 1986) ............................................................ 10

*In re TMA Associates, Ltd.,*
 129 B.R. 643 (Bankr. D. Colo. 1991) ............................................................ 19

*Miller v. Alagna,*
 138 F. Supp. 2d 1252 (C.D. Cal. 2000) ............................................................ 20, 22

*Packard Bell NEC, Inc. v. Aztech Sys.,*
 2001 U.S. Dist. LEXIS 11194, *26-27 (C.D. Cal. 2001) ............................................................ 22

*State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.,*
 72 Cal. App. 4th 1422 (1999) ............................................................ 13, 22

*Terrebonne, Ltd. Of California v. Murray,*
 1 F. Supp. 2d 1050 n.12 (E. D. Cal. 1998) ............................................................ 18, 19

*Truck Insurance Exchange v. Fireman's Fund Insurance Co.,*
 6 Cal. App. 4th 1050 (1992) ............................................................ 13

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-iii-

Case 3:03-cv-01035-JSW Document 47 Filed 07/25/03 Page 4 of 28

**TABLE OF AUTHORITIES (cont'd)**

(Page)

*Value Property Trust v. Zim Co.*
  *(In re Mortgage & Realty Trust)*,
  195 B.R. 740 (Bank. C.D. Cal. 1996)...................................................................... 10, 15

**Statutes**

11 U.S.C. § 549(a)(2)(A)........................................................................................... 21

California Business & Professions Code section 6068(e) .......................................... 14

California Corporations Code section 16201 ............................................................. 17

California Corporations Code section 16307 ............................................................. 17

California Corporations Code section 16403 ................................................... 16, 17, 18

California Corporations Code section 16403(6 .......................................................... 17

California Corporations Code section 16403(c)(2) ..................................................... 17

California Corporations Code section 16957 ............................................................. 17

Fedr. Bankr. P. Rule 2004 ......................................................................................... 3

**Other Authorities**

ABA Model Code of Professional Responsibility Canon 4 ......................................... 7

ABA Model Code of Professional Responsibility Canon 5 ......................................... 7

ABA Model Code of Professional Responsibility Canon 9 ......................................... 7

Bankruptcy Local Rule 1001-2,
  U.S. Bankruptcy Court, Northern District of California ........................................ 10

California Rule of Professional Conduct 3-600 ......................................................... 18

California Rules of Professional  Conduct 3-600(a) ................................................... 11

California Rules of Professional Conduct 3-310 ............................................... 7, 10, 20

Civil Local Rule 11-4(a)(1), U.S. District Court, Northern District of California .......... 9

Civil Local Rule 11-4(a), U.S. District Court, Northern District of California .............. 10

Civil Local Rule 11-4(b), U.S. District Court, Northern District of California .............. 10

1   PLEASE TAKE NOTICE that on August 6, 2004, at 10:00 a.m., or as soon thereafter as the

2   matter may be heard, in Courtroom 22 located at 235 Pine Street, San Francisco, CA 91404, the

3   Honorable Dennis Montali, United States Bankruptcy Judge, will hold a hearing on this Motion

4   filed by Ronald F. Greenspan, chapter 7 trustee (the "Trustee") for Brobeck, Phleger & Harrison

5   LLP (the "Debtor"). Pursuant to order of this Court, **any objection to this Motion must be filed**

6   **with the Bankruptcy Court and served upon counsel for the Trustee at the address noted**

7   **above so as to be received by August 3, 2004.** Only those parties who have timely filed and

8   served responses will be heard at the hearing. If there is no timely objection to the requested relief,

9   the Court may enter an order granting the Motion without further notice and a hearing.

10  **I.      RELIEF REQUESTED**

11  By this Motion, the Trustee moves the Court for an order, substantially in the form of

12  Exhibit A hereto, disqualifying the firm of Pachulski, Stang, Ziehl, Young, Jones & Weintraub (the

13  "Firm"), which was formerly counsel to the Debtor, from representing former partners of the

14  Debtor (the "Partners"), whose interests are directly adverse to the estate's interests in this case.

15  This Motion is based upon the record in this case and the Declarations of M. Freddie Reiss

16  ("Reiss Decl."), Maryam Ghazi ("Ghazi Decl."), Bennett J. Murphy ("Murphy Decl."), Martin

17  Herrmann ("Herrmann Decl.") and Stephen R. Thames ("Thames Decl.") and on the following:[1]

18  **II.      INTRODUCTION**

19  The Firm should be disqualified from acting as counsel for the Partners in this case. The

20  Firm served as counsel to the Debtor for approximately eight months prior to and after the petition

21  commencing this case, giving advice to the Debtor on a broad range of matters, including a number

22  of matters for which the Partners' interests are directly adverse to the estate's interests. For

23  example, as part of its engagement, the Firm gave advice to the Debtor and presumptively obtained

24  the Debtor's confidences concerning the estate's potential claims against the very Partners whom

25  the Firm now purports to represent. Among other things, the Firm also advised the Debtor in

26  structuring and implementing a prepetition scheme to transfer away from the reach of the Debtor's

27  _____

28  [1]   Exhibits are attached to the Ghazi, Murphy and Thames Declarations, as indicated.

-1-

Case: 03-32715   Doc# 355   Filed: 07/07/04   Entered: 07/07/04   Page 6 of
28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

creditors – and to a group that includes the very Partners that the Firm now claims as clients – the Debtor's valuable causes of action against the Clifford Chance firm and others. The Trustee has commenced an adversary proceeding that seeks to avoid that scheme, apparently hatched by the Firm, as a fraudulent conveyance. On these and many other matters, absent disqualification of the Firm, the estate will be in the unfortunate position of facing its former counsel in current as well as prospective litigation over the very matters on which the Firm was engaged by the Debtor.

There is no question that the Debtor was a client of the Firm. Shortly after entering dissolution in February 2003, which was effected by an Amended and Restated Partnership Agreement (the "Dissolution Amendment"), the Debtor expressly retained the Firm to render insolvency services via a retention agreement executed for the Debtor by Stephen M. Snyder, as Chair of the Debtor's "Liquidation Committee." In the Debtor's Dissolution Amendment, Mr. Snyder had been named to lead a group of Partners to manage the Firm's winding up.[2] After being retained by the Debtor, lawyers at the Firm met "weekly at least" and "often daily" with the Liquidation Committee, and met "regularly" with other Partners involved in the Firm's dissolution. During that time, the Firm advised the "Partnership and its Partners" about "numerous issues" regarding dissolution, including "possible claims that might be asserted by [the Debtor's] creditors against [Partners]" and also received financial information about the Debtor. Murphy Decl. Exh. 10 (Miller Declaration ¶¶8, 9 and 14). According to records maintained by the Liquidation Committee, the Debtor paid the Firm over $100,000 in legal fees from February to October, 2003.

After the filing of an involuntary bankruptcy petition against the Debtor, and with the inevitable entry of an order for relief against their client approaching, the Firm switched sides and determined to represent the Partners and no longer represent the Debtor. The Firm and Mr. Snyder, who himself is among the clients that the Firm now represents in matters adverse to the Debtor, executed a purported "waiver" permitting the Firm to fire the Debtor and represent the Partners

---

[2]  Pursuant to the Dissolution Amendment, the rights and powers of the Liquidation Committee were those "necessary or appropriate to marshal the assets of the [Debtor], to bill and collect from clients and other persons, to pay creditors, to distribute assets, and otherwise to wind up the business and affairs of the [Debtor]." Murphy Decl. Exh. 11, ¶9(b)(iii).

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

Case: 03-32715  Doc # 953  Filed: 07/26/04  Entered: 07/26/04 11:09:26  Page 7 of 28

despite obvious conflicts of interest arising from its existing representation of the Firm. Through this contrived conflict "Waiver," designed to benefit both the Firm and its new clients with no regard to the interest of the Debtor or its creditors, the Firm "dropped" the Debtor, which would no longer be a lucrative client, in favor of a more lucrative client, the Partners.

The contemporaneous written records uncovered so far by the Trustee (a retention agreement, invoice, and correspondence) all show that the Debtor in fact was the Firm's sole client in this matter. Despite this clear record, the Court has now been presented with two additional scenarios as to who exactly was the Firm's client on the bankruptcy petition date: (a) the Firm's recent statement (made in its pleadings challenging the Settlement Agreement with Clifford Chance) that it "consulted with" the Liquidation Committee and the Partners; and (b) a declaration of another Liquidation Committee member, James Miller (filed in support of the Firm's motion to avoid turning over client files generated when the Debtor was a client of the Firm and otherwise resisting production of documents to the Trustee under a Rule 2004 subpoena), that the "nature and scope of [the Firm's] engagement was to advise the Partnership and its Partners."

The latest obfuscations are irrelevant, as one thing is crystal clear: There is no way for the Firm to represent the Partners without marshaling evidence and taking positions directly adverse to interests of the estate as to matters on which it served the Debtor. Accordingly, the Firm should be disqualified from representing any of the Partners in this case.

## III.   FACTUAL BACKGROUND

### A.   Events Leading Up To The Debtor's Bankruptcy.

At the time of or as a result of its dissolution, the Debtor was in default and owed tens of millions of dollars under its prepetition credit agreement and office leases, among other debts. It should not disputed that the Debtor was insolvent during the entire period of the Firm's representation. On September 17, 2003 (the "Petition Date"), creditors filed an involuntary chapter 7 petition against the Debtor. The Debtor did not contest the petition, and an order for relief under chapter 7 of the Bankruptcy Code was entered on October 10, 2003 (the "Order for Relief"). On October 14, 2003, Interim Trustee E. Lynn Schoenmann was appointed by the Office of the U.S. Trustee, and on November 21, 2003, Ronald Greenspan was elected as the chapter 7 Trustee.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   Prior to the events leading to the Debtor's demise, it was a prominent national law firm with

2   nearly 900 lawyers and offices in California, New York, Colorado, Virginia, Texas, and

3   Washington, D.C. In the late 1990s and early 2000s, fueled by a booming technology-sector

4   practice, the Debtor rapidly expanded, nearly doubling the number of its attorneys in just over three

5   years. During that period, the Debtor also opened several new branch offices and expanded others,

6   incurring substantial debt and lease obligations.

7   In early 2001, the Debtor began to borrow heavily, using debt to maintain the levels of cash

8   flow to which its partners had recently become accustomed, while also funding investments in

9   future growth. The Firm's borrowing levels reached approximately $71 million, or $366,000 per

10   partner, in early 2001, and approximately $90 million, or $430,000 per partner, in early 2002. *See*

11   Herrmann Decl. ¶¶3, 5. Thereafter, the Debtor experienced waves of departures by partners and its

12   profitability declined. Net income per partner, which had reached approximately $1 million in

13   2000, fell to $610,000 in 2001, a 39% drop, and to $515,000 in 2002, a 15.6% drop from the prior

14   year and a 48.5% drop from 2000. Herrmann Decl. ¶6. This was despite the Firm receiving a

15   $23.8 million bonus payment in mid-2002 from its successful representation of asbestos maker

16   Western MacArthur in asbestos insurance litigation. Herrmann Decl. ¶7. Had that one-time

17   windfall not been received, profits per partner would have been dramatically lower still. By the end

18   of 2002, the Firm was faced with substantial excess capacity and overhead, a glut of under-utilized

19   attorneys, and an oppressive level of debt.

20   This culminated in the Debtor's formal cessation of operations and dissolution as of

21   February 10, 2003, which was effected by the Dissolution Amendment of that same date. Murphy

22   Decl. Exh. 11.

23   **B.  The Debtor's Retention Of The Firm.**

24   The Dissolution Amendment provided for the immediate formation of a "Liquidation

25   Committee" and designated Stephen M. Snyder as its Chair. Murphy Decl. Exh. 11 at 15, ¶9(b)(i),

26   (iv). Snyder subsequently appointed other former Partners to serve as members of the Liquidation

27

28

Case: 03-32715   Doc# 355   Filed: 07/26/04   Entered: 07/26/04 17:09:26   Page 9 of
28

Committee, including Miller and Luther Orton. Snyder, Miller & Orton are all present clients of the Firm.[3]

On or around March 26, 2003, Snyder executed a letter agreement for the retention of the Firm by the Debtor, with an effective date of February 25, 2003 (the "Retention Agreement"). Ghazi Decl. Exh. 1. The Retention Agreement identified the Firm's sole client as "Brobeck Phleger & Harrison LLP" and provided, among other things, the following:

- The Debtor retained the Firm to "advise the LLP with respect to winding up the business of the [Debtor] under the [Uniform Partnership Act of 1994] and generally with respect to the [Debtor's] rights and obligations, if any, against and to its lenders, lessors, partners, employees and creditors, among others." (¶1; emphasis added);

- The Firm was explicitly "not retained to (a) initiate or defend litigation, or (b) defend an involuntary bankruptcy petition commenced against the Debtor." (¶1);[4]

- The Debtor agreed to pay a retainer of $75,000 to the Firm and pay for the Firm's services and reimburse it for expenses. (¶2);

- The Firm agreed to conduct its representation of the Debtor "in accordance with the highest legal and ethical standards governing the practice of law." (¶3; emphasis added);

- The Debtor had the right to terminate the relationship upon written notice. (¶3);

- The Firm had a right to withdraw from the relationship for several stated reasons, including "for any other reason for which withdrawal is authorized or required under applicable law or rules of professional conduct . . . ." (¶3).

The Retention Agreement did not disclose that the Firm represented any parties other than the Debtor as to the subject matter of the representation, nor did it provide for any waiver of prospective or actual conflicts of interest with any such clients. After the execution of the Retention Agreement, the Debtor sent at least two checks and two cashier's checks to the Firm totaling approximately $200,000, and the Firm and the Debtor exchanged correspondence regarding payment for the Firm's services. Ghazi Decl. Exhs. 2-9. In addition, the Trustee has

---

[3] Together they have formed a law firm which has recently filed papers seeking to block the Firm from providing the Trustee with documents, client files, and testimony relating to the Firm's representation of the Debtor. *See infra* at 7-8.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK PHLEGER & HARRISON LLP

Case 03-32715 Doc#993 Filed: New Jersey Partners of Brobeck Phleger & Harrison LLP
28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

obtained a copy of the billing statement for the Firm's initial representation of the Debtor for the time period February 25, 2003 through March 31, 2003. Ghazi Decl. Exh. 3. The letter transmitting this invoice states it is for "services rendered to Brobeck, Phleger & Harrison LLP." During the period of the invoice, the Firm's bill reflects time entries spent on issues relating to claims against "departed Brobeck Partners" and for attending partner meetings. *Id.*

### C. The Purported "Waiver" Of The Firm's Conflict Of Interest.

On October 3, 2003 – one week prior to the entry of the Order for Relief, two weeks after the Petition Date, and long after the Firm had started representing the Debtor – the Firm and Snyder executed a document titled "Conflict Waiver, Consent to Representation of Certain Partners and Disclosure" (the "Waiver"). Murphy Decl. Exh. 12. The signature block of the Waiver states Snyder was executing it on behalf of the Debtor in his capacity as Chair of the Liquidation Committee. *Id.* at 2. The letter states the Firm had requested the Waiver "[t]o enable [the Firm] to undertake representation of the Brobeck Partners." *Id.* at 1 (emphasis added). The "Brobeck Partners" include Snyder, Miller, and Orton, the three members of the Liquidation Committee.

Among other things, the Waiver states that "[n]o information was communicated to the Firm that was not intended to be kept confidential from the Brobeck Partners" but also spells out the "[n]ature of possible conflicts." Specifically, the Waiver provides the following:

> 1. *No information was communicated to [the Firm] that was not intended to be kept confidential from the [Partners].* [The Debtor] acknowledges that [the Firm] has not received information from [the Debtor] that was intended to be kept confidential from the [Partners]. Since no information was communicated to [the Firm] that [the Debtor] or the Liquidation Committee wished to keep confidential from the [Partners], [the Debtor] has determined that [the Firm's] prior representation of [the Debtor] does not give rise to concerns that [the Firm] might communicate confidential information received from [the Debtor] or the Liquidation Committee to the [Partners].

> 2. *Nature of possible conflicts.* The interests and objectives of [the Debtor's] creditors, or the [the Debtor's] bankruptcy estate, if an order for relief under Title 11 of the United States Code is entered, on certain matters may differ from the interests and objectives of the [Partners]. For example, creditors, persons acting on behalf of creditors, or [the Debtor's] bankruptcy estate, may assert claims against the [Partners]: (i) to recover

---

[4]     The parties at least contemplated that the Firm may have been called upon to "file a voluntary bankruptcy petition on behalf of the LLP," because that language was initially included in the sentence quoted above, but appears to have been stricken and initialed by Snyder. *Id.*

Case: 03-32715   Doc# 003   Filed: 10/07/03   Entered: 10/03/03 11:20:11   Page 11 of 28

alleged avoidable transfers; (ii) for breach of fiduciary duty, mismanagement, fraud or intentional misconduct; (iii) for diversion of partnership assets; or (iv) for the recovery of the proceeds of unfinished business. <u>Since the [Partners] dispute these claims, it is likely that actual conflicts may arise between the [Partners] and representatives of [the Debtor]</u>.

*Id.* at 1, ¶¶1 and 2 (emphasis added). Based on the foregoing, Snyder purported to "waive, to the fullest extent possible, any and all claims of a conflict of interest arising from the Firm's prior <u>or current</u> representation of [the Firm] and its future representation of [the Debtor] based on Ethical Canons 4, 5, and 9 of the Model Code of Professional Responsibility, Rule 3-310 of the California Rules of Professional Conduct, and all disciplinary rules related thereto . . . ." *Id.* at 2, ¶4(b) (emphasis added).[5]

### D. The Subpoena Issued To The Firm And The Resulting Motion To Quash.

On June 2, 2004, after numerous oral and written requests were unsuccessful, the Trustee served a subpoena on the Firm seeking the production of its client file for the Debtor – *i.e.*, documents created during the time in which the Firm represented the Debtor. On July 14, 2004, the Debtor's current counsel, Kornfield, Paul & Nyberg, P.C. and the law firm of Snyder, Miller & Orton LLP (individually and as the Liquidation Committee), jointly filed a Motion for Order Vacating Rule 2004 Order and Quashing Subpoena Served On Pachulski (the "<u>Motion to Vacate</u>"), seeking to vacate the order and quash the subpoena directed to the Firm requiring production of documents by the Firm. Miller filed a declaration in support of the Motion to Vacate, which described the relationship among the Firm, the Debtor and the Partners (the "<u>Miller Declaration</u>"). Among other things, the Miller Declaration states the following:

- Snyder appointed Miller and Orton as members of the Liquidation Committee on February 12, 2003, and the Liquidation Committee retained the Firm as counsel to the "Brobeck LLP Partnership." (¶¶7, 8);

- The Liquidation Committee consulted with the Firm on a "wide range of issues," including "<u>possible claims that might be asserted by Brobeck creditors against Partners</u>." (¶9; emphasis added);

---

[5] Canon 4 provides that "[a] lawyer should preserve the confidences and secrets of a client," Canon 5 provides that "[a] lawyer should exercise independent professional judgment on behalf of a client," and Canon 9 provides that "[a] lawyer should avoid even the appearance of impropriety." Rule 3-310 is titled "[a]voiding representation of adverse interests."

-7-

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

Case: 05-52159 Doc#: 199-1 Filed: 06/09/06 Entered: 06/09/06 22:47:59 Page 2 of 28

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

- The Firm met at least weekly with the Liquidation Committee and regularly with the partners involved in the Firm's dissolution, during which time "[q]uestions about a wide variety of legal issues were asked and answered. . . ." (¶¶11; 12);

- The "nature and scope of Pachulski's engagement was to advise the Partnership and its Partners about the numerous legal issues, existing and future, that present themselves in law firm dissolution under conditions of insolvency." (¶13; emphasis added);

- "During the course of the representation, Pachulski was exposed to financial information concerning the firm and its partners." (¶14; emphasis added);

- On October 3, 2003 – the same day on which the Liquidation Committee purported to waive on behalf of the Debtor any conflict with the Firm's representation of the Partners – the Liquidation Committee "discharged" the Firm and "retained" Kornfield, Paul & Nyberg, P.C. (¶¶9, 15).

Murphy Decl. Exh. 10 (Murphy Declaration) (emphasis added).

### E. The Firm Seeks Permission On Behalf Of The Partners To File An Opposition To The Motion To Approve The Settlement Agreement With The Clifford Chance Parties.

On July 14, 2004, the Firm filed an ex parte application and a motion to continue the hearing date on the Trustee's motion (the "Settlement Motion") for approval of a settlement agreement reached with Clifford Chance parties (the "Continuance Motion"). Murphy Decl. Exhs. 13, 14. The Firm stated that it had filed the Continuance Motion on behalf of 120 Partners (listing Miller, Snyder, and Orton), 113 of whom filed proofs of claim against the estate. Murphy Decl. Exh. 14 (Continuance Motion at 1, nn.1, 3).

The Firm's objection to the Settlement Motion bears upon a matter directly within the scope of its services to the Debtor. Per the Miller Declaration, the Firm's services included advice respecting "maximizing the value of and structuring (on the advice of litigation counsel) claims held by [the Debtor] against Clifford Chance, and the related transfer of those claims into a trust." Murphy Decl. Exh. 10 (Miller Declaration ¶9). As set forth in the Settlement Motion, the transfer of the Debtor's claims against Clifford Chance into a trust was made while the Debtor was insolvent and for less than reasonably equivalent value. Murphy Decl. Exh. 13 (Settlement Motion at 4-5). Among other things, as a result of the transfer, the Partners and other former partners (who were among "favored" creditors of the Debtor) would receive more from recoveries in the Clifford Chance litigation than they otherwise would upon ratable payment of their claims against the

-8-

Case: 05-52715   Doc#: 355   Filed: 07/20/04   Entered: 07/20/04 11:55:20   Page 13 of 28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Debtor in the Debtor's bankruptcy case. *Id.* For all of these reasons, the Trustee filed a Complaint simultaneously with the Settlement Motion seeking to set aside the transfers of the Debtor's claims against Clifford Chance. In a new revelation to the Trustee, these transfers have not only occurred on the Firm's watch, but on the advice of the Firm.

Moreover, in objecting to proposed settlement with Clifford Chance, the Firm apparently has abandoned any pretense of loyalty (or even neutrality) with respect to its former client (the Debtor), and has wholeheartedly embraced the self-serving efforts of its new clients (the Partners) to establish that the Debtor was solvent and financially viable until the very end, thereby protecting the millions of dollars of distributions received by the Partners in the months before the Debtor dissolved. *See* Murphy Decl. Exh. 14 (Continuance Motion at 3-4); Murphy Decl. Exh. 10 (Motion to Vacate at 2) (opposing the Trustee's effort to obtain the Debtor's client file from the Firm on the grounds that, allegedly, "[i]t is plain as punch that the Trustee wants to invade the [alleged] privilege so he can better put together his lawsuits against the partners").

The Firm's has taken positions adverse to the estate's in litigation beyond this Court. As set forth in the Thames Decl., the Firm is defending eighty (80) former partners in litigation commenced pre-petition by one of the Debtor's landlords to enforce personal liability of a group of partners of the Debtor's obligations under a lease. Thames Decl. ¶¶ 5, 6. Thames declares that he was contacted by the Firm on two occasions in 2003 – once where the Firm held itself out as Debtor's counsel, *id.* at ¶ 3, and later where it the firm held itself out as counsel to the partner defendants. *Id.* at ¶ 6. This representation is also adverse to the interests of the estate; as a matter of mathematics, since the Debtor's potential co-liability under the lease would increase to the extent the Firm were to succeed in its defense of the partners.

## IV. ARGUMENT

### A. Well-Established Ethical Rules Preclude The Firm's Representation Of The Partners And Require The Firm's Disqualification.

The Firm is bound by the ethical constraints of the Rules of Professional Conduct of the State Bar of California, as adopted by the Bankruptcy Court. *See* Civil L.R. 11-4(a)(1) (providing that attorneys must "[b]e familiar and comply with the standards of professional conduct required

-9-

Case: 03-32715 Doc#: 883 Filed: 02/06/04 Entered: 02/06/04 Page 14 of 28
28

of members of the State Bar of California"); B.L.R. 1001-2 (incorporating Civil L.R. 11-4(a) & (b) Standards of Professional Conduct); *see also Value Property Trust v. Zim Co. (In re Mortgage & Realty Trust)*, 195 B.R. 740, 748 (Bank. C.D. Cal. 1996) (bankruptcy court practitioners must comply with standards of professional conduct required of members of State Bar of California).[6]

Because the Firm has violated both its duty of loyalty to the Debtor and its duty to maintain the Debtor's confidences, it should be disqualified from representing the Partners. *In re Jaeger*, 213 B.R. 578 (Bankr. C.D. Cal. 1997) (duties of loyalty and confidentiality must be considered separately). If there is a doubt as to the existence of a conflict of interest, the conflict should be resolved in favor of disqualification. *See, e.g., In re South Pacific Island Airways*, 68 B.R. 574, 576 (Bankr. D. Hawaii 1986).

### 1. Representation Of The Partners Would Violate The Firm's Duty Of Loyalty To The Debtor.

California Rule of Professional Conduct 3-310, entitled "Avoiding the Representation of Adverse Interests," provides in part that "[a] member [of the bar] shall not, without the informed written consent of each client: (1) Accept representation of more than one client in a matter in which the interests of the client potentially conflict; or (2) Accept representation of more than one client in a matter in which the interests of the clients actually conflict; or (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." Rule 3-310.

Rule 3-310 embodies the fundamental duty of undivided loyalty owed by all attorneys to their clients. It precludes the Firm's representation of the Partners regardless of whether the Firm represented the Debtor (as per the written record) or simultaneously represented the Debtor and all or some of the Partners. While the Firm's representation included matters identical to its current representation of the Partners, under Rule 3-310, the Firm would be precluded from representing

---

[6] For the convenience of the Court, the Trustee has provided copies of all of the ethical rules cited in this Motion in the attached Appendix.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

Case: 03-32715   Doc# 359   Filed: 07/20/04   Entered: 07/20/04 17:09:26   Page 15 of 28

In *Flatt v. Superior Court*, 9 Cal. 4th 275 (1994), the California Supreme Court reaffirmed
the central importance of the duty of loyalty in the dual representation context, stating:

> The primary value at stake in cases of simultaneous or dual representation is the
> attorney's duty – and the client's legitimate expectation – of loyalty, rather than
> confidentiality. . . .  In evaluating conflict claims in dual representation cases, the
> courts have accordingly imposed a test that is more stringent than that of
> demonstrating a substantial relationship between the subject matter of successive
> representations.  Even though the simultaneous representations may have nothing in
> common, and there is no risk that confidences to which counsel is a party in the one
> case have any relation to the other matter, disqualification may nevertheless be
> required.  Indeed, in all but a few instances, the rule of disqualification in
> simultaneous representation cases is a per se or "automatic" one.[7]

*Flatt*, 9 Cal 4th at 284 (emphasis in original; citations omitted).

*Flatt* described the "[t]he paradigmatic instance of such prohibited dual representation" as
"one roundly condemned by courts and commentators alike . . . where the attorney represents
clients whose interests are directly adverse in the same litigation" (although the prohibition against
such representation was not limited to actual litigation).  *Id.* at 285 n.3 (emphasis in original).  In
*Flatt*, the Supreme Court aptly characterized the mandatory rule of disqualification in dual
representation cases (even cases involving unrelated matters) as "analogous to the biblical
injunction against 'serving two masters' (Mathew 6:24)" and "self-evident."  *Id.* at 286.

The Firm has recently described itself as "serving two masters" through its after-the-fact
assertion that it represented both the Debtor and the Partners.  Its first and foremost duty was to the
Debtor, the entity that both retained and paid the Firm.  *See* Cal. R. Prof. Conduct 3-600(a) ("[i]n
representing an organization, a member shall conform his or her representation to the concept that

---

[7]     The only "exception" to the rule of automatic disqualification mentioned in *Flatt* is where
"full disclosure is made and both [clients] agree in writing to waiver the conflict."  9 Cal. 4th at 285
n.4.  The Trustee is not aware of any written waiver executed by the Partners, and even if such
waiver existed, the purported "Waiver" executed on behalf of the Debtor is impermissibly tainted
and, as discussed more fully below, ineffective to bind the Trustee.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-11-

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS
COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK PHLEGER & HARRISON LLP

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    the client is the organization itself, acting through its highest authorized officer, employee, body or

2    constituent overseeing the particular engagement").[8]

3          The interests of the Firm and the Partners have been, and currently are, diametrically

4    opposed on many matters.  Indeed, from the outset of its representation, the Firm recognized that

5    claims could be asserted by the Debtor against the Partners.  For example, the Retention Agreement

6    provided that the Debtor retained the Firm to, among other things, **advise the LLP . . . with**

7    **respect to the LLP's rights and obligations, if any, against and to its . . . partners.**"  Ghazi

8    Decl. Exh. 1 ¶1 (emphasis added).  The Miller Declaration acknowledges that the Liquidation

9    Committee consulted with Pachulski on a number of issues, including "possible claims that might

10   be asserted by **Brobeck creditors against Brobeck Partners**."  Murphy Decl. Exh. 10 (Miller

11   Declaration ¶9)s (emphasis added).

12         Thus, in attempting to simultaneously represent the opposing interests of the Debtor and the

13   Partners, the Firm violated its obligation, as set forth in its Retention Agreement with the Debtor, to

14   conduct its representation of the Debtor "in accordance with the highest legal and ethical standards

15   governing the practice of law."  Ghazi Decl. Exh. 1.  The Firm should be disqualified from now

16   representing the Partners.

17         **2.    The Firm Violated The "Hot Potato Rule" By "Dropping" The Debtor**
18              **In Favor Of The Partners.**

19         This is a classic case for the application of the "aptly named 'hot potato rule,' that is, the bar

20   on curing dual representation conflicts by the expedient of severing the relationship with the

21   preexisting client."  *Flatt*, 9 Cal. 4th at 288.  Put another way, "[a] lawyer may not avoid the

22   automatic disqualification rule applicable to concurrent representation of conflicting interests by

23   unilaterally converting a present client into a former client." *American Airlines, Inc. v. Sheppard,*

24   *Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1037 (2002); *see also State Farm Mut. Auto.*

25   _____

26   [8]    In his declaration, Miller states that some of the Debtor's partners may have contributed
         personal funds toward payment of Brobeck's fees.  Murphy Decl. Exh. 10 (Miller Declaration ¶10).
27       However, the information possessed by the Trustee does not support this allegation in any way.
         Even if true, such payments would be irrelevant in light of the clear record that, at a minimum, the
28       Debtor was a client of the Firm.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   *Ins. Co. v. Federal Ins. Co.*, 72 Cal. App. 4th 1422, 1433 (1999) (finding that despite a "fortuitous

2   settlement [that] acted to sever McCormick's relationship with its preexisting client, it did not

3   remove the taint of a three-month concurrent representation. Consequently, the mandatory

4   disqualification rule applies").

5          The court in *Truck Insurance Exchange v. Fireman's Fund Insurance Co.*, 6 Cal. App. 4th

6   1050 (1992), explained the basis for the rule and applied it to disqualify counsel:

7              The per se disqualification rule . . . is . . . based on the premise that courts should not
               allow a law firm to profit from a conflict of interest which it created. This is the
8              potential result when a law firm discards a less profitable relationship in
               contemplation of taking on a more profitable, conflicting representation. . . . In such
9              cases, law firms will not be permitted to drop one client in favor of another.

10

11  *Id.* at 1059 (emphasis added). In *American Airlines*, where the attorney's existing relationship with

12  a client was terminated in order to undertake a relationship with an entity that was pursuing the

13  client's documents, the court held that a conversion designed to avoid a concurrent representation

14  of adverse interests "may itself be a breach of loyalty" and that the attorney and his firm "exhibited

15  an absence of loyalty" when the relationship with a former client was severed in favor of a

16  "preferred position" with another entity. *Id.* at 1037, 1044.

17         The Liquidation Committee apparently "discharged" the Firm on October 3, 2003, the same

18  day on which the Liquidation Committee purported to waive on behalf of the Debtor any conflict

19  with the Firm's representation of the Partners. On or around that same day, the Liquidation

20  Committee "retained" the firm of Kornfield, Paul & Nyberg to represent the Debtor. Murphy Decl.

21  Exh. 10 (Miller Declaration ¶¶ 9, 15).[9] However characterized, the practical effect of the efforts by

22  the Firm and the Liquidation Committee to permit the Firm to represent the Partners (including

23  members of the Liquidation Committee) even though, at the time of the Waiver, the Debtor was a

24  client of the Firm. The Firm's actions in favoring the Partners over the Debtor are prohibited by

25  the "hot potato" rule and require the Firm's disqualification.

26

27  _____

[9]        The Trustee has seen no document evidencing such a discharge, but has no reason to doubt
28  the information contained in Mr. Miller's declaration previously submitted to the Court.

-13-

Case: 03-32715   Doc# 333   Filed: 07/28/04   Entered: 07/28/04 17:09:28   Page 18 of
28

### 3. The Firm Violated Its Duty To Maintain Client Confidences.

Disqualification is also warranted based on the Firm's successive representative of the Debtor and the Partners. Rule 3-310(E)[10] "governs successive representation of clients with adverse interests. An attorney is forbidden from undertaking a representation adverse to a former client if there is a 'substantial relationship' between the current and former matters." *Flatt*, 9 Cal. 4th at 283. Courts have recognized that in the successive representation situation, the primary fiduciary value jeopardized is that of client confidentiality, rather than loyalty. *Id.*; *see also* Cal. Bus. & Prof. Code section 6068(e) (stating that it is the obligation of every attorney "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client").

A "substantial relationship" between the former representation and the current representation is said to exist "when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client [that] confidential information material to the current dispute would normally have been imparted to the attorney . . . ." *H. F. Ahmanson & Co. v. Salomon Brothers*, 229 Cal. App. 3d 1445, 1454 (1991). Stated another way, "the courts . . . look . . . at the practical consequences of the attorney's representation of the former client. The courts ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *Id.* (emphasis added). The court should "focus on the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases. As part of its review, the court should examine the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy.'" *Id.* at 1455 (emphasis added; citations omitted). If there is a "substantial relationship" between the subject

---

[10] Rule 3-310(E) provides the following: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

-14-

Case 3:03-cv-03359-... Document 107 Filed 07/28/... Page 19 of 28
28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

matter of the successive representations, the presumption that the Firm received confidential information is irrebuttable. *Mortgage & Realty Trust*, 195 B.R. at 753.

In *City National Bank v. Adams*, 96 Cal. App. 4th 315 (2002), the court addressed the application of Rule 3-310(E) in the context of a motion to disqualify an attorney for undertaking successive representation of adverse interests and set forth the following guidelines for determining disqualification:

> Our analysis of the case law involving successive representation of clients leads us to three conclusions that guide resolution of this case. First, if the nature of the representation is such that confidences <u>could have been exchanged</u> between the lawyer and the client, courts will <u>conclusively presume they were exchanged</u>, and disqualification will be required. Second, there is a limited exception to this conclusive presumption in the rare instance where the lawyer can show that there was no opportunity for confidential information to be divulged. Third, the limited exception is not available when the lawyer's former and current employment are on opposite sides of the very same matter or the current matter involves the work the lawyer performed for the former client. <u>When the lawyer switches sides in an ongoing dispute such as the one between the parties in this case, the nature of the former representation will always be such that the exchange of relevant confidences must be presumed.</u>

*Id.* at 327-328 (emphasis added).[11]

There is no question that a "substantial relationship" existed between the Firm's representation of the Debtor and its representation of the Partners. As a result, the Firm is conclusively presumed to have exchanged confidences with the Debtor from February to October of 2003. In light of the Firm's participation in the Debtor's partnership meetings and its rendering of advice to the Liquidation Committee on a wide range of issues, including potential claims

---

[11]  *See also H.F. Ahmanson & Co.,* 229 Cal. App. 3d at 1459 (stating that in the situation where actual receipt of confidential information from a former client can be shown, disqualification is mandatory); *Flatt,* 9 Cal. 4th at 283 ("[w]here the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is <u>presumed and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm</u>") (emphasis added); *Henricksen v. Great American Savings & Loan,* 11 Cal. App. 4th 109, 117 (1992) ("[W]here an attorney is disqualified because he formerly represented and therefore possesses confidential information regarding the adverse party in the current litigation, vicarious disqualification of the entire firm is compelled as a matter of law").

Case: 03-32715   Doc# 935   Filed: 07/16/04   Entered: 07/16/04 17:09:16   Page 20 of 28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   against the Partners, this is not a "rare instance" where the Firm can show that there was no

2   opportunity for confidential information to be divulged. Murphy Decl. Exh. 10 (Miller

3   Declaration); Ghazi Decl. Exh. 1 (Retention Agreement).

4       Moreover, even if the Firm somehow could show an utter lack of any such divulgence of

5   information, the limited exception does not apply because the Firm and the Partners are on the

6   opposite sides of the same matters and the Firm's representation of the Partners involve the same

7   work that the Firm performed for the Debtor. Indeed, the purported "Waiver" lists the following

8   claims that may be asserted by the Debtor's creditors or the estate against the Partners: "(i) to

9   recover avoidable transfers; (ii) for breach of fiduciary duty, mismanagement, fraud or intentional

10  misconduct; (iii) for diversion of partnership assets; or (iv) for the recovery of the proceeds of

11  unfinished business." Murphy Decl. Exh. 12 at 1, ¶2. The "Waiver" additionally states that

12  "[s]ince the Partners dispute these claims, it is likely that actual conflicts may arise between the

13  Brobeck Partners and representatives of [the Debtor]." Id.[12] In short, during its representation of

14  the Debtor, the Firm must have had information about potential claims against the Partners, and the

15  Partners should not be permitted to benefit from the knowledge gained by the Debtor's former

16  counsel.

17      Despite the obvious opportunities for the Firm to gain information, the Firm contends in the

18  Continuance Motion that no conflict of interest exists "because, among other things [the Firm]

19  could not have received any information from [the Debtor] that was intended to be maintained as

20  confidential from the [ ] Partners since partners are entitled to all information with respect to the

21  partnership (Cal. Corp. Code section 16403) and under applicable law, the Firm would be

22  considered to have represented the partners in connection with its prior engagement." Murphy

23  Decl. Exh. 14 at 7-8.

24

25

---

26  [12]    On October 31, 2003 (less than a month after the Order for Relief), during a conversation
    between a partner of the Firm and Mr. Reiss, then the Interim Trustee's lead financial consultant, the
27  Firm's partner indicated that he had analyzed the potential issues which might arise between the
    Debtor and the Partners and that the Firm had already conducted "extensive research" as to six
28  possible issues that the Trustee might assert against the Partners. Reiss Decl. ¶¶3, 4.

-16-

Case 3:03-cv-04890-JSW Document 52 Filed 03/04/2004 Page 21 of 28
28

1    Here, the Firm's non-denial denial fails for a number of reasons. First, the notion that there

2  can never be a client confidence exchanged between a partnership and its counsel as to any matter

3  in which the partnership and the partner have differing interests defies common sense as well as the

4  record in this case. As stated in the Retention Agreement and confirmed in the Miller Declaration,

5  the Firm was hired expressly to render advice to the Debtor as to its claims against partners. Ghazi

6  Decl. Exh. 1; Murphy Decl. Exh. 10. Yet, the Firm would ask this Court to agree that this

7  representation had to be conducted under the enormous handicap that no information it obtained

8  from the potential plaintiff – the Debtor – could ever be concealed from any of the potential

9  defendants – the Partners. This proposition is flatly inconsistent with numerous provisions of the

10  Revised Uniform Partnership Act in effect in California. *See, e.g.,* Cal. Corp. Code § 16201

11  (partnership is entity distinct from its partners); Cal. Corp. Code § 16307 (Partnership may sue and

12  be sued in its own name); Cal. Corp. Code § 16803 (after dissolution, a partnership continues until

13  the winding up of its business is concluded); Cal. Corp. Code § 16957 (partners liable to a limited

14  liability partnership to the extent of partnership distributions made while insolvent).[13]

15    The Firm's reliance on Cal. Corp. Code section 16403 is simply wrong on the face of the

16  statute. Section 16403 is titled "Books and Records" and merely provides that partners may have

17  access to the partnership's books and records; nothing is said as to other documents or information,

18  such as communications between the partnership and counsel, or counsel's work product. *See* Cal.

19  Civ. Code § 16403(6). The blanket interpretation of Section 16403(b) is, among other things,

20  completely undercut by the language of Section 16403(c). The partnership's obligation thereunder

21  to furnish information beyond "books and records" is inapplicable to the extent the demand or the

22  information demanded is "unreasonable or otherwise improper under the circumstances." *Id.*

23  § 16403(c)(2). Section 16403 does not support the Firm's blanket claim that partners are entitled to

24  all information relating to the partnership, including as to the partnership's claims against them,

25  under all circumstances.

26

27  _____

28  [13]    For the convenience of the Court, the Trustee has provided copies of these statutory sections.

-17-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Nor does anything in section 16403 supports the Firm's conclusion that a sharing of

2    partnership information, whether or not required under state law, magically forgave its breach of

3    the duty of loyalty it owed to the partnership.  If anything, the prospect that the Firm would blithely

4    conclude (and, apparently, advise the Debtor) that it had to share all of the Debtor's confidences

5    with Partners, including with respect to claims to be asserted against them, only underscores the

6    Debtor's need for independent counsel with a continuing and undivided loyalty.

7        The Firm's denial does not even begin to address its breach of the duty of loyalty and alone

8    is not enough to withstand disqualification.  *See Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App.

9    4th 671, 687-688 (2004) ("To the extent Wilkins's declaration asserted that he had no access to and

10   did not acquire any confidential information during his tenure at McCormick, it constituted an

11   ineffective "cursory denial").  And, since the members of the Liquidation Committee are part of the

12   larger group of Partners now represented by the Firm, it is particularly difficult to believe that the

13   information learned by the Firm in its capacity as counsel to the Debtor prior to the entry of the

14   Order for Relief will not be shared or used against the Debtor in later litigation.[14]

15
     **B.    The Purported "Waiver" Executed By The Chairman Of The Liquidation**
16   **        Committee On Behalf Of The Debtor Is Ineffective.**

17       **1.    Waiver By An Interested Party Is Prohibited.**

18   California Rule of Professional Conduct 3-600 is titled "Organization as Client" and

19   provides that when representing an organization, a lawyer "shall conform his or her representation

20   to the concept that <u>the client is the organization itself</u>, acting through its highest authorized officer,

21   employee, body or constituent overseeing the particular engagement."  (Emphasis added).

22   Subsection (E) provides:

23           A member [of the Bar] representing an organization may also represent any of its
24           directors, officers, employees, members, shareholders, or other constituents, subject

25   _____

26   [14]    At the very least, the Firm's conduct gives rise to the appearance of impropriety and should
     not be condoned by this Court.  *See, e.g., Terrebonne, Ltd. Of California v. Murray*, 1 F. Supp. 2d
27   1050, 1061 n.12 (E. D. Cal. 1998) (stating that "[a]s officers of the court, the disqualified attorneys
     are under a duty to avoid the appearance of impropriety as well as actual unethical conduct" and
28   finding that the attorneys' conduct at issue in the case "both has the appearance of and is improper").

-18-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Rule 3-600(E) (emphasis added). Here, the purported after-the-fact conflict "Waiver" was signed by Snyder, one of the Partners proposed to be represented by the Firm. On its face, therefore, the "Waiver" is inadequate purely as a matter of the ethical requirements of the State Bar.

Moreover, bankruptcy Courts have recognized the inherent problem with an interested party attempting to consent to a dual representation. The Court in *In re Plaza Hotel Corporation* determined that a purported consent to dual representation given by an interested party on a corporation's behalf was "not effective in bankruptcy":

> Such consent is an intramural agreement that is not obtained at arm's length; it is the product of the same person changing hats. A better argument for consent can be made when the issue has been aired, by way of full, candid and complete disclosure, to all parties in interest and has failed to attract opposition. <u>In this instance, the trustee's objection vitiates any consent.</u>

*In re Plaza Hotel Corp.*, 111 B.R. 882, 891 (Bankr. E.D. Cal. 1990) (emphasis added). In *In re TMA Associates, Ltd.*, 129 B.R. 643 (Bankr. D. Colo. 1991), the Court disqualified counsel from representing the debtor, expressly finding that written waivers obtained from the general partners of the debtor partnership were <u>insufficient to waive the conflict of interest</u> as to representation of the debtor itself. *Id.* at 647. The Court offered this helpful analogy:

> If the people who actually make the decision to consent are the same individuals whose interests are in conflict, that consent is suspect . . . [I]t is problematical that effective consent could be given by the limited partnership. Such consent would of necessity be given by the general partner. . . . <u>This situation creates a circumstance much like the fox in the hen house.</u>

*Id.* at 648 (emphasis added); *see also Terrebonne, Ltd.*, 1 F. Supp. 2d at 1067-1068 (finding that conflicting concurrent representation of parties, even if fully and adequately disclosed, "could not have been waived because it would have resulted in a breach of both the attorney's duty of confidentiality and the duty of loyalty owing to his first client").

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

Case: 03-32715   Doc# 359   Filed: 07/20/04   Entered: 07/20/04 17:09:26   Page 24 of 28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## 2. The Purported Waiver Was Untimely.

Rule 3-310 requires an <u>advance</u> written waiver from each client as to actual and potential conflicts. Cal. R. Prof. Conduct 3-310. Based on the Firm's assertion that it represented both the Debtor and the Partners from the outset, the Firm had a duty to address its conflicts up front, whether or not the Firm believed that even a potential conflict existed. *Miller v. Alagna,* 138 F. Supp. 2d 1252, 1256 (C.D. Cal. 2000). When an attorney undertakes joint representation, "the failure to obtain a written consent to a potential conflict of interest . . . in effect gives a wild card to each of the clients. <u>At any time thereafter during the representation, any of the clients can play the card and require the withdrawal of the attorney (and the attorney's law firm) entirely from the case.</u>" *In re Jaeger*, 213 B.R. at 586 (emphasis added). The Trustee is not aware of any waivers executed by the Debtor or the Partners prior to the purported Waiver executed on behalf of the Debtor by Snyder.

## 3. The Waiver Was Given In Violation Of The Duties Of The Liquidation Committee As Managers Of An Insolvent Firm.

It is not disputed (and indeed has been admitted) that, following its dissolution, the Firm was insolvent. As has long been recognized, the managers of an insolvent firm exercise their powers subject to a duty to the insolvent firm's creditors. *See, e.g., In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 361 (S.D.N.Y. 2001). Here, among the assets of the insolvent Debtor were claims against the Partners including, without limitation, claims for returns for distributions made during the Debtor's insolvency. Yet, despite the duty of the Liquidation Committee – as managers of the Debtor – to maximize the value of such recoveries for the benefit of creditors, the "Waiver" had the opposite effect: <u>The Debtor's adversaries, the former Partners, were benefited by having access to the services and work product of the Debtor's own counsel, including the fruits of the Firm's work investigating potential claims against them.</u>

Moreover, the "Waiver" was given without providing for the Firm's work product, learning and knowledge, or other information to be preserved for the benefit of the Debtor's estate. Indeed, the Trustee's efforts to obtain the Firm's files and work product have been to no avail, as the Firm has jealously guarded its right to retain the fruits of its representation of the Debtor to be used only

-20-

Case: 03-32715   Doc# 939   Filed: 07/26/04   Entered: 07/26/04 17:09:20   Page 25 of 28

in conducting its defense against the Debtor's claims. Accordingly, the Court should exercise its sound discretion to preclude the Firm and the Partners from succeeding in their postpetition effort to legitimize this course of conduct.

### 4. The Purported Waiver Was Beyond The Scope Of The Winding Up The Business Of The Firm.

The purported postpetition "Waiver," on the eve of an Order for Relief, of the Debtor's right to enforce the duty of loyalty and duty to maintain confidences of the Firm does not and should not bind the Trustee.

As of the Petition Date, the Debtor had been in dissolution for over half year, and had long since ceased to operate as a law firm. During this period, under California law, its sole function was to wind up its former business. Pursuant to the Dissolution Amendment, the powers of the Liquidation Committee were defined solely with reference to the winding up of its business under the Revised Uniform Partnership Act. Murphy Decl. Exh. 11, ¶1(b).

No provision of the Dissolution Amendment, or of the Revised Uniform Partnership Act, supports Snyder's authority to waive the Debtor's rights to undivided loyalty and maintaining client confidences for the benefit of the Partners, including himself. Murphy Decl. Exh. 11. Nor is the "Waiver" consistent with Snyder's obligations under the Dissolution Amendment, the Revised Uniform Partnership Act, and the Bankruptcy Code to wind up the affairs of the Firm in a manner which preserves value to the fullest extent for the benefit of creditors.

In any event, under section 549(a)(2)(A) of the Bankruptcy Code, the Trustee may avoid the "Waiver" as a transfer of the Debtor's valuable property because it occurred after the commencement of the case and was authorized – if at all – only under section 303(f) of the Code and was given for no consideration whatsoever. 11 U.S.C. § 549(a)(2)(A).

### C. Denial Of This Motion On The Basis Of Delay Is Not Warranted.

The Firm has previously argued that any motion to disqualify filed by the Trustee must be denied on the ground of unreasonable delay. *See, e.g.*, Murphy Decl. Exhs. 15, 17. Mere delay in making a disqualification motion is not dispositive. *Packard Bell NEC, Inc. v. Aztech Sys.*, 2001

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-21-

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

Case: 03-32715   Doc# 355   Filed: 07/26/04   Entered: 07/26/04 17:09:26   Page 26 of 28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   U.S. Dist. LEXIS 11194, *26-27 (C.D. Cal. 2001). Rather, "the delay must be extreme in terms of

2   time and consequence." *Id.* The onus is on the Firm to "demonstrate a prima facie case of

3   inexcusable delay." *Id.* The Firm's filing of the Continuance Motion (and a related motion to

4   shorten time) is its first substantive filing in the case since the qualification of the Trustee.

5   Moreover, as the Court is aware, the Trustee has no funds available not subject to the lien of the

6   Debtor's purported secured creditor, Citibank, FSB.[15] Any delay in making the motion was not

7   extreme in terms of either time or consequence. *See also Miller v. Alagna,* 138 F. Supp. 2d 1252,

8   1259 (2000) (six month delay not sufficient to defeat disqualification); *State Farm Mutual*

9   *Automobile Ins. Co.*, 72 Cal. App. 4th at 1433 (two year delay not sufficient to defeat

10   disqualification); *Jaeger*, 213 B.R. at 594 (recognizing that Trustee needed time before bringing

11   disqualification motion to learn about the case). In fact, as recognized in *Jaeger*, "the failure to

12   obtain a written consent to a potential conflict of interest . . . in effect gives a wild card to each of

13   the clients. <u>At *any time* thereafter during the representation, any of the clients can play the card and</u>

14   <u>require the withdrawal of the attorney (and the attorney's law firm) entirely from the case.</u>" *Jaeger*,

15   213 B.R. at 586 (emphasis added).

16       As at least as a partial result of the financial constraints on the Trustee, there has been no

17   contested matter or adversary proceeding between the Debtor and the Firm's present clients. Given

18   the estate's obvious need to avoid unnecessary incurrence of professional expenses, there is no

19   logic to support prejudicing the estate in such a severe way. The Trustee has asserted the rights of

20   the estate properly immediately upon the Firm's first appearance in any dispute with the Trustee.

21   Accordingly, this Court should find that denial of the Trustee's Motion on this basis of "extreme

22   delay" is not warranted.

23       Nor can the Firm or its present clients claim prejudice, as they were and have been fully

24   aware that the Trustee's rights were being reserved in full with respect to the Firm's improper

25   decision to switch clients on the eve for order for relief. Early this year, the Trustee gave notice to

26

27   [15]   A hearing has been set for July 23, 2004 on a motion to seek approval of use of cash

28   collateral and a loan from certain unsecured creditors of the Debtor. Approval of this motion would
make available funds for the payment of professionals of the Trustee for the first time in the case.

Case: 03-32715   Doc# 359   Filed: 07/20/04   Entered: 07/20/04 17:09:20   Page 27 of
28

the Firm that it should be disqualified from representing clients adverse to the Debtor during the bankruptcy case. Murphy Decl. Exh. 18. The Trustee flatly rejected the notion that the estate's rights were so easily to be ignored in this chapter 7 case. In an exchange of correspondence over several weeks, the Trustee expressly reserved the estate's rights, and moreover sought assurances from the Firm that if the Trustee chose to meet with them, the estate would not see the fact of such a meeting used against it in proceedings respecting disqualification. Murphy Decl. Exhs. 16, 17. The Firm and its present clients were fully on notice of the Trustee's position with respect to the matters addressed in this Motion.

## V. CONCLUSION

For the foregoing reasons, the Motion should be granted in its entirety and the Firm should be disqualified as counsel for the Partners.

DATED: July 20, 2004

HENNIGAN, BENNETT & DORMAN LLP
Bennett J. Murphy
James O. Johnston
Linda A. Kontos

By: _____
     Bennett J. Murphy
Counsel for Ronald Greenspan
Chapter 7 Trustee for Brobeck, Phleger & Harrison LLP

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

NOTICE OF MOTION AND MOTION TO DISQUALIFY PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB AS COUNSEL FOR CERTAIN INDIVIDUALS WHO ARE FORMER PARTNERS OF BROBECK, PHLEGER & HARRISON LLP

Case: 03-32715   Doc# 935   Filed: 07/26/04   Entered: 07/26/04 17:09:26   Page 28 of 28